UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ORELVIS FELIZ,

                              Petitioner,                    03 Civ. 9751 (RPP)

             - against -                          **OPINION AND ORDER**

JAMES T. CONWAY,

                              Respondent.
-------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

        Orelvis Feliz ("Petitioner") brings this petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254, challenging his conviction for attempted murder in the

second degree, assault in the first degree, and criminal possession of a weapon in the

second degree, following a jury trial in New York State Supreme Court, New York

County.  In his pro se petition, Petitioner alleges that (1) "The evidence was legally

insufficient to sustain the appellant's conviction"; (2) "The appellant was denied his

constitutional right to a fair trial"; (3) "The sentence imposed was harsh and excessive"; [1]

(4) "The appellant was denied the effective assistance of counsel"; (5) "Defendant's [sic]

was denied his constitutional right to adequate pre-trial and trial representation";

(6) "Defendant was deprived of his constitutional right to effective assistance of counsel,

by counsel's failure to give the defendant due process of law"; (7) "Defendant's

constitutional right to effective assistance of counsel was violated, when counsel failed to

_____

        [1] Petitioner did not file a memorandum of law in support of the instant petition, and he
makes no argument to support his claim of a harsh and excessive sentence in his Reply
Memorandum.  Because Petitioner's sentence was not in violation of New York Penal Law and
was undisturbed on appeal, this Court declines to address this claim.

object to material evidence being adduced by the prosecutor at trial, which resulted in the judgment of conviction." (Pet.'s Mem. at 4.)

In his Memorandum of Law in Reply to the Respondent's Answer Opposing Petition for a Writ of Habeas Corpus ("Pet.'s Reply Mem."), filed September 28, 2004, Petitioner re-states his grounds for relief as: (1) "The evidence was legally insufficient to sustain the petitioner's conviction beyond a reasonable doubt"; (2) "The petitioner's deprivation of his constitutional right to have a fair trial before an unbiased court, and an unprejudiced jury, is cognizable for review, and in all respect meritorious"; (3) "Petitioner's constitutional rights to effective assistance of counsel were violated in all respect." (Pet.'s Reply Mem.)

For the reasons set forth below, Petitioner's § 2254 petition is denied.

**BACKGROUND**

On November 13, 1996, a judgment was entered in New York State Supreme Court, New York County, convicting Petitioner, after a jury trial, of attempted murder in the second degree (N.Y. Penal Law §§ 110.00, 125.25(1)); assault in the first degree (N.Y. Penal Law § 120.10(1)); and criminal possession of a weapon in the second degree (N.Y. Penal Law § 265.03). Petitioner was acquitted of the charge of assault in the first degree under a depraved indifference theory. Petitioner was sentenced to concurrent terms of 12-1/2 to 25 years' imprisonment on the attempted murder count and 7-1/2 to 15 years' imprisonment on the assault and weapon possession counts.

The Appellate Division, First Department, affirmed Petitioner's conviction, rejecting his claims of legally insufficient evidence of guilt, inadequate inquiry into the jurors' exposure to media accounts, ineffective assistance of trial counsel, and excessive

sentence. (Pet.'s App. Br., attached as Ex. A to Resp.'s Opp. Mem.)[2] The First

Department, by order entered June 8, 2000, found:

> The verdict was based on legally sufficient evidence and was not
> against the weight of the evidence. There was overwhelming
> circumstantial evidence that defendant fired the revolver that accidentally
> wounded an eight-year-old bystander, including eyewitness testimony that
> he hid an object in the spot where the weapon was recovered moments
> later. Defendant's homicidal intent was clearly established by evidence
> that he fired six shots at his intended victim, with whom he had an
> ongoing drug-related dispute.
> Defendant's ineffective assistance claim is entirely lacking in
> specificity and unsupported by the record, which establishes that
> defendant received meaningful representation.
> We perceive no abuse of sentencing discretion.

People v. Feliz, 273 A.D.2d 59, 59-60, 708 N.Y.S.2d 873 (1st Dept. 2000) (citation

omitted). The Appellate Division found Petitioner's remaining claims "unpreserved." Id.

at 60. By letter dated July 6, 2000, Petitioner sought leave to appeal to the New York

Court of Appeals. The application was denied on November 21, 2000. People v. Feliz,

95 N.Y.2d 934 (2000).

On February 8, 2002, Petitioner, proceeding pro se, moved, pursuant to Section

440.10 of the New York Criminal Procedure Law, to vacate his conviction on the

grounds that he was deprived of effective assistance of counsel prior to trial and during

trial in violation of the U.S. Constitution and the New York Constitution, and that the

judgment of conviction was obtained based on fraud and misrepresentation by the

prosecution and the trial court. (Pet.'s Notice of Motion for Relief Pursuant to N.Y.

Crim. Proc. Law § 440.10, attached as Ex. F to Resp.'s Opp. Mem.)

---

[2] Respondent's Answer to Petitioner's § 2254 petition includes an Appendix containing
the parties' post-trial briefs with exhibits containing additional exhibits, as well as post-trial court
decisions in the state proceedings.

By order dated March 14, 2003, Hon. Leslie Crocker Snyder denied Petitioner's Section 440.10 motion. People v. Feliz, Ind. No. 359/96, slip op. (Sup. Ct., New York Co. Mar. 14, 2003). By order dated October 10, 2003, the Appellate Division, First Department denied Petitioner's leave to appeal the denial of his Section 440.10 motion. People v. Feliz, Ind. No. 359/96, slip op. (1st Dept. Oct. 23, 2003). The instant Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 followed.

**DISCUSSION**

**I.      Standard of Review**

A petitioner in custody pursuant to a state court judgment is entitled to habeas relief if he can show that his detention violates the U.S. Constitution or the laws or treaties of the United States. 28 U.S.C. § 2254(a). If a petitioner's claims were previously decided on the merits, habeas relief may be granted only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). When a state court (1) disposes of the claim on the merits; and (2) reduces its disposition to judgment, it adjudicates a petitioner's federal claim "on the merits," and thus triggers this highly-deferential standard of review "even if the state court does not explicitly refer to either the federal claim or to relevant federal case law". See Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001).

## II.    Petitioner's Claims for Relief

### A.  Legally Insufficient Evidence

Petitioner asserts that the evidence presented at trial was insufficient to support his conviction.[3]  In Petitioner's appeal to the Appellate Division, First Department, he claimed that the trial evidence was insufficient to prove his guilt beyond a reasonable doubt and that the verdict was against the weight of the evidence.  (Pet.'s App. Mem., attached as Ex. A to Resp.'s Opp. Mem., at 7-11.)  The Appellate Division disagreed, concluding that "[t]he verdict was based on legally sufficient evidence and was not against the weight of the evidence."  Feliz, 273 A.D.2d at 59.   Because the Appellate Division's order affirming Petitioner's judgment of conviction was an adjudication on the merits, Petitioner cannot obtain habeas relief unless the adjudication resulted in a decision that was "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on an unreasonable application of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. § 2254(d).

A petitioner challenging the sufficiency of the evidence underlying his conviction bears "a very heavy burden."  Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002) (citation and quotation marks omitted).  To succeed on such a claim, a petitioner must demonstrate that "no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 324 (1979); see also Ponnapula,

---

[3] To the extent that Petitioner also claims that the verdict was against the weight of the evidence, this claim is not cognizable in a habeas corpus proceeding.  See Ventura v. Artuz, No. 99 Civ. 12025 (AJP), 2000 U.S. Dist. LEXIS 10167, at *25 n.12 (S.D.N.Y. Jul. 19, 2000); Rodriguez v. O'Keefe, No. 96 Civ. 2094 (LLS), 1996 U.S. Dist. LEXIS 10808, at *12 (S.D.N.Y. Jul. 31, 1996), aff'd, 122 F.3d 1057 (2d Cir. 1997).  Courts are precluded from reviewing a weight of the evidence claim because it is a "pure state law claim."  Correa v. Duncan, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001).

297 F.3d at 179; Quartararo v. Hanslmaier, 186 F.3d 91, 97 (2d Cir. 1999). When reviewing a petitioner's sufficiency of the evidence claim, a federal habeas court must construe the evidence in the light most favorable to the prosecution and defer to the jury's resolution of any conflicts in the testimony and its assessment of the witness's credibility. Jackson, 443 U.S. at 319; see also Bossett v. Walker, 41 F.3d 825, 830 (2d Cir. 1994) (explaining that the jury is "exclusively responsible for determining a witness' credibility"). "[A] federal habeas court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326.

The evidence presented at trial was more than sufficient to support the jury's finding of guilt. This case arose out of a gunfight between two individuals around 8:30a.m. on January 23, 1996, at the intersection of 105th Street and Columbus Avenue in Manhattan. During the shoot-out, an eight-year-old boy, John Paul Valentine, was wounded and seriously injured by a .38 caliber bullet. The prosecution's case consisted primarily of the testimony of Anthony Ortiz, who pleaded guilty to attempted murder in the second degree shortly before trial on a promise of a sentence of imprisonment from 15 years to life. After pleading guilty, Ortiz entered into a cooperation agreement with the prosecution, which provided that he give truthful testimony at trial and his sentence would be reduced to 12 years to life. At trial, Ortiz testified that he, Manny DeLeon, and the Petitioner were involved in a drug-related dispute the day before the shoot-out; that all three individuals were crack sellers, and that Petitioner was selling gold-capped crack similar to that distributed by Ortiz and DeLeon at their "spot," the intersection of 105th

Street and Columbus Avenue; that DeLeon and Petitioner had gotten into a physical fight; that Ortiz had kicked Petitioner in the mouth, and DeLeon had thrown Petitioner against a window; and that Petitioner had chased them with a butcher knife.[4]

Ortiz further testified that the morning after his dispute with DeLeon and Petitioner, he had come to the "spot" armed with a nine-millimeter Glock automatic pistol. While he was on the southwest corner of 105th Street and Columbus Avenue, Petitioner, who was on the southeast corner of that intersection, fired shots at him, and Ortiz returned the fire and further shots were exchanged. Ortiz was arrested by police a few minutes later while fleeing down 104th Street near Columbus Avenue. Four spent nine-millimeter shells from a nine-millimeter Glock automatic were recovered on the southwest corner of Columbus Avenue and 105th Street.[5]

Several witnesses saw the exchange of gun shots. The intersection was busy, as parents with children were going to a public school, located on 105th Street, west of Columbus Avenue. Witnesses who were previously familiar with Ortiz testified that he was present at the location and in possession of a firearm. Other witnesses gave general testimony corroborating Ortiz's account of the incident, but none identified Petitioner and corroborated that it was he who had fired shots at Ortiz. Anthony Amodeo, a truck driver who was driving downtown at the intersection, confirmed that the first shots came from the southeast corner of Columbus Avenue and were returned by shots from the southwest corner. A twelve-year-old girl testified that the shooter on the southeast corner was wearing a gray or navy jacket with gold lettering that looked like a New York City

---

[4] The owner of the liquor store at the corner of 105th Street and Columbus Avenue corroborated the time of the fight and that Petitioner had chased "Tony" (Ortiz) with a knife.

[5] Two nine-millimeter bullets were recovered east of Columbus Avenue.

Housing Authority ("NYCHA") jacket, and that the shooter ran towards Central Park. A mother, taking her children to school, said the first shots came from behind her on the southeast corner of 105th Street and Columbus Avenue. A school crossing guard saw a man on the southeast corner and a man on the southwest corner shooting guns.

John Paul Valentine testified that he was wounded just outside the school. After he was wounded, a police officer took him to the emergency room and took possession of a .38 caliber bullet he observed fall from the wounded child's clothing. A screenwriter who resided at 69 West 105th Street heard shots and saw a man wearing a NYCHA jacket with letters on the back running east toward Central Park and holding a gun above his head. A building superintendent at 54 West 105th Street saw a man in a blue jacket with yellow letters holding a gun overhead and running along West 105th Street towards Central Park West. Marie Perez, of 58 West 105th Street, saw Petitioner running on West 105th Street towards Manhattan Avenue with a revolver. Perez saw him stop in front of 54 West 105th Street and heard him say, "He hit me yesterday first," in response to her question, "[C]hild, what have you done?" Police Officer Lozupone pursued and arrested Ortiz after hearing the gunshots. Lozupone apprehended Ortiz and proceeded to Central Park with him in a police car. Lozupone then went back to the shooting scene and recovered four spent shells and two nine-millimeter spent rounds from the crime scene police. (Trial Tr. at 359-60.)

A nineteen-year-old girl, on the way to an abortion clinic, stated that Ortiz had given her the Glock automatic at 104th Street and Columbus Avenue and that she had subsequently thrown it in the East River.

At approximately the time of the shoot-out, Police Officer Zaccari saw two males sprinting east on 104th Street, one of whom was wearing a blue jacket with yellow letters spelling NYCHA. Zaccari testified that the man in the blue NYCHA jacket entered Central Park at 103rd Street, and that the other male was a twelve-year-old boy wearing a green jacket. Zaccari entered Central Park at 103rd Street and found Petitioner coming towards him attempting to remove his jacket. Zaccari testified that Petitioner then moved behind a large rock. Zaccari next saw the Petitioner between two benches still wearing the blue jacket and bending over with his hands close to ground. Petitioner then ran, and Zaccari gave chase and arrested Petitioner 50 feet away. Petitioner was wearing a NYCHA jacket when he was arrested. (Trial Tr. at 429-31; GX 14.)

After arresting Petitioner, Officer Zaccari spoke with a man with a dog in Central Park, and, thereafter, observed Police Officer Velez recover a .357 magnum revolver near the benches where Zaccari had seen the Petitioner. Lieutenant Mele testified that he took possession of the .357 magnum revolver from Officer Velez, and that the revolver was then vouchered by Police Officer Sarracino.

The man with a dog testified that he had seen Petitioner drop something in the area of the benches and shuffle the leaves with his feet.

Police Officer Velez testified that, soon after the crime was reported, he went to Central Park West on a scooter. Once there, he spoke with the man with a dog, and then searched among the leaves near the bench area and found the .357 magnum revolver with six spent shells.

Detective Steven Fiorica, a ballistics expert, testified to the operability of the .357 magnum revolver and stated that all six chambers of the revolver had evidence of

discharge. He further stated that he test-fired the revolver four times and compared the spent test rounds to the spent .38 caliber round found in John Paul Valentine's clothes. In Fiorica's opinion, based on similarities between the markings on the spent .38 caliber round found in John Paul Valentine's clothes and the markings on the spent test-fired rounds, the spent .38 caliber round was fired from the .357 magnum revolver to the exclusion of any other firearm.

Petitioner called two witnesses at trial. Ms. Santana testified that Petitioner had been the victim of a severe beating the day before the incident and that she had seen Petitioner just before the shoot-out at Columbus Avenue and 105th Street but had not seen him with a gun. The second witness, Mr. DeLeon, testified that he was not present the morning of the shooting but admitted that he had a green jacket and that he had fought with Petitioner the day before the shoot-out.

In view of the evidence linking Petitioner to the weapon that wounded John Paul Valentine, and the witnesses who described a person in a NYCHA jacket in possession of a gun on the southeast corner of Columbus Avenue and 105th Street, the witnesses who placed Petitioner at the scene of the crime, and the witnesses who saw a man fleeing the scene with a gun and wearing a NYCHA jacket with yellow letters on the back (i.e., the type of jacket Petitioner was wearing at his arrest a few minutes later), there is no question that, contrary to Petitioner's first claim, there was sufficient evidence presented at trial to corroborate Ortiz's testimony and to sustain Petitioner's convictions for attempted murder in the second degree, N.Y. Penal Law §§ 110.00 and 125.25, assault in the first degree, N.Y. Penal Law § 120.10, and criminal possession of a weapon in the second degree, N.Y. Penal Law § 265.03.

### B.  Constitutionally Unfair Trial

Petitioner's second claim in his Petition and Reply Memorandum is that he was denied his constitutional right to a fair trial before an unbiased court and an unprejudiced jury.  In particular, Petitioner argues that during jury selection the trial judge, Justice Snyder, did not properly inquire into the jurors' exposure to news broadcasts and local press reports about the shoot-out and the injuries sustained by John Paul Valentine.

As the Respondent points out, "petitioner did not object to the method or sufficiency of Justice Snyder's inquiry into the jurors' exposure to news accounts about petitioner's case, nor did petitioner ever claim that he may have been deprived of his right to a fair trial because of such publicity."  (Resp.'s Opp. Mem. at 33.)  For this reason, when Petitioner presented this claim on appeal to the Appellate Division, the Appellate Division rejected Petitioner's "remaining contentions"—which included Petitioner's claim that his trial was constitutionally unfair—because they were "unpreserved."  Feliz, 273 A.D.2d at 60.  Accordingly, because the Appellate Division's "explicit invocation of the procedural bar" constitutes an "independent" and "adequate" state ground to reject the claim, Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999), federal habeas review is unavailable for this claim, Coleman v. Thompson, 501 U.S. 722, 735 (1991).  In addition, Petitioner is unable to "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law," or that the failure to consider his claim "will result in a fundamental miscarriage of justice."  Coleman, 501 U.S. at 750.

Even if habeas review was available for Petitioner's claim that Justice Snyder failed to take proper measures to ensure that the jurors had not been exposed to news accounts which would affect the judgment of Petitioner's case, under the deferential

standard of review established by 28 U.S.C. § 2254(d),[6] Petitioner is not entitled to relief on this claim.

A criminal defendant has the right to a trial before "a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961). However, "[q]ualified jurors need not . . . be totally ignorant of the facts and issues involved." Murphy v. Florida, 421 U.S. 794, 799-800 (1966). The Supreme Court has set aside state convictions based on publicity surrounding the trial where the trial was conducted in a "carnival atmosphere," Sheppard v. Maxwell, 384 U.S. 333, 358 (1966), or dominated by a "wave of public passion." Irvin, 366 U.S. at 728. In determining whether a trial was not fundamentally fair, courts must consider the "totality of the circumstances." Murphy, 421 U.S. at 799.

In Bennet v. Peters, Judge Chin summarized how a court should respond to a claim that publicity or press coverage prejudiced a jury.

> [A] court should engage in the three-step inquiry established by the Second Circuit in United States v. Lord, 565 F.2d 831, 838 (2d Cir. 1977). First, the court must decide whether the publicity was of a kind that could prejudice the jury and whether members of the jury could have been exposed to that publicity. Id. At this point in the inquiry, "if the information [disclosed by the publicity] is clearly innocuous or the possibility of the jury's exposure to it is remote, further inquiry may not be necessary." Id. Second, if the court determines that there is potential for prejudice, the jurors should be questioned to ascertain if they have learned of the potentially prejudicial material. Third, any juror who responds that he or she has been exposed to the material should be examined individually. Id.

---

[6] As noted above, the Appellate Division declined to review Petitioner's claim after finding that it was "unpreserved." Nonetheless, the Appellate Division also stated that if it "were . . . to review [the unpreserved claims], we would reject them." Feliz, 273 A.D.2d at 60. Thus, the claim was adjudicated on the merits, see Cotto v. Herbert, 331 F.3d 217 (2d Cir. 2003), and the standard of review established by 28 U.S.C. § 2254(d) applies here.

Bennet v. Peters, No. 96 Civ. 3661 (DC), 1997 U.S. Dist. LEXIS 4646, at *5-6 (S.D.N.Y. Apr. 14, 1997).  "Absent a clear abuse of the trial court's discretion, one that results in manifest prejudice to defendant, the finding made by the trial judge that the jury was fair and unbiased must be upheld."  Ruzas v. Sullivan, No. 85 Civ. 4801 (CBM), 1988 U.S. Dist. LEXIS 8632, at *25 (S.D.N.Y. Aug. 2, 1988) (quoting United States v. Moon, 718 F.2d 1210, 1219 (2d Cir. 1983), cert. denied, 466 U.S. 971 (1984)).  Furthermore, the state court's finding that the jury was impartial is entitled to a "presumption of correctness," and "'the trial court's findings of impartiality [may] be overturned only for manifest error.'"  Knapp v. Leonardo, 46 F.3d 170, 176 (2d Cir. 1995) (quoting Patton v. Yount, 467 U.S. 1025, 1031 (1984)).

The press clippings, which Petitioner attaches as exhibits to his Reply Memorandum, are either undated or bear dates in January 1996.  The voir dire and trial took place from September 30, 1996 to October 22, 1996, over nine months after the incident was reported in the media.  Petitioner presents no evidence of pretrial publicity in close proximity to the trial.

During jury selection, Justice Snyder described the case generally and alerted the jury to the pretrial publicity.  Justice Snyder stated:

> I should also indicate that there were [p]ress accounts about this case.
> If anyone has read or seen anything about this case, we need you to tell us that on an individual basis.

(Voir Dire Tr. at 18.)[7]

> This case did receive some press at the time of the arrest and has been written up at various times in the press.  I don't know whether it has

_____

[7] One juror was excused on consent because he did not think he could be fair.  (Voir Dire Tr. at 24-25.)

13

been on the radio or television. I would say it probably has been. If any
of you have read, seen, or heard anything about this case . . . tell me after I
ask you other questions and come up individually and let me know that.

(Id. at 27.)

There was some [p]ress in this case. It has been in the papers a
number of times. I mention that in case any of you read accounts of it.
We will need to know that at the appropriate time.

(Id. at 53.)

During the voir dire questioning, three prospective jurors revealed that they were

aware of the events being litigated and did not feel they "could be fair." Those jurors

were excused on consent. (Id. at 66-67, 135-36, 136-37). Later, a juror was excused

after he remembered he had heard about the case on the news. (Id. at 144.) Thereafter, in

her opening remarks and throughout the trial, Justice Snyder admonished the jury not to

read or listen to any news accounts of the case if that should occur. (Trial Tr. at 26-27,

289-91, 475-76, 479-80, 629, 745.) Since no jurors who stated they had read or heard

about the case were retained, and the trial judge was careful to admonish the jury

periodically about listening to or reading press reports of the trial, the strictures of United

States v. Lord, 565 F.2d 831 (2d Cir. 1977), were not violated.

Petitioner also claims his constitutional right to a fair trial was violated because

Justice Snyder did not permit him to be present during part of the voir dire. (Reply Mem.

at 31.) Petitioner bases this claim on his absence during the voir dire on the morning of

September 30, 1996. (Voir Dire Tr. at 16-25.) Justice Snyder excused the defendant for

that period for what she referred to as "scheduling"—an explanation to the first panel of

prospective jurors of the nature of the case and how a three-week trial would likely affect

the jurors. (Id.) At the end of this session, Justice Snyder excused some of the

prospective jurors after allowing them to explain why they would be unable to serve. She also excused one juror who volunteered that he could not be fair. (Id. at 24-25.) Two other panels were similarly instructed while Petitioner was present. Petitioner makes no claim that he was not present during the final interviews of jurors from these panels, which included questioning about their employment, education, families, and matters bearing on their ability to be fair and unbiased. (Id. at 25-155.) Accordingly, Petitioner's claim that his constitutional right to a fair trial was violated when he was absent from the voir dire on the morning of September 30, 1996 is without merit.

## C. Ineffective Assistance of Counsel

Petitioner next claims that he was denied the effective assistance of trial counsel. Specifically, the instant petition makes four related claims: Petitioner "was denied the effective assistance of counsel"; Petitioner "was denied his constitutional right to adequate pre-trial and trial representation"; Petitioner "was deprived of his constitutional right to effective assistance of counsel, by counsel's failure to give [Petitioner] due process of law"; and Petitioner's "constitutional right to effective assistance of counsel was violated, when counsel failed to object to material evidence being adduced by the prosecutor at trial, which resulted in the judgment of conviction." (Pet.'s Mem. at 4.)

Petitioner asserted an ineffective assistance of counsel claim on direct appeal to the Appellate Division. In rejecting his claim, the Appellate Division stated that it was "entirely lacking in specificity and unsupported by the record, which establishes that [Petitioner] received meaningful representation." Feliz, 273 A.D.2d at 60. Following the denial of Petitioner's application for leave to appeal to the New York Court of Appeals, Feliz, 95 N.Y.2d 934, Petitioner moved pro se to vacate the judgment of conviction

pursuant to New York Criminal Procedure Law § 440.10, claiming that his trial counsel was ineffective.  On March 14, 2003, Justice Snyder denied the motion and held that Petitioner received effective assistance of counsel under both the federal and state standards.  Feliz, Ind. No. 359/96, slip op. at 2 (Sup. Ct., New York Co. Mar. 14, 2003) (stating that allegations of ineffective assistance were "clearly belied by the record").  The Appellate Division denied Petitioner's application for leave to appeal Justice Snyder's order.  Feliz, Ind. No. 359/96, slip op. (1st Dept. Oct. 23, 2003).  Accordingly, because Petitioner's ineffective assistance of counsel claims in his direct appeal and his § 440.10 motion were rejected on the merits, this Court must review the ineffective assistance of counsel claims in the instant petition under 28 U.S.C. § 2254(d).  Thus, Petitioner cannot obtain habeas relief unless the adjudication resulted in a decision that was "contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or was based on an unreasonable application of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. § 2254(d)(1)-(2).

To bring a successful claim for ineffective assistance of counsel, a petitioner must show both (1) that his counsel's performance was deficient and (2) that his counsel's deficient performance prejudiced the petitioner.  See Strickland v. Washington, 466 U.S. 668, 687 (1984).  To establish deficiency, a petitioner must show that his attorney's performance "fell below an objective standard of reasonableness."  Strickland, 466 U.S. at 688.  To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.

As for Petitioner's claim of ineffective pretrial counsel (the fourth and fifth claims in his § 2254 Petition and Point IV in his Reply Memorandum), a review of the trial record and Respondent's Appendix, Volumes I and II, reveals that on February 20, 1996, Petitioner's counsel received the state's voluntary disclosure form providing a bill of particulars, identification information, written reports of statements of Feliz and Ortiz, a narcotics laboratory report and a ballistics report, and photographs of evidence seized. On April 16, 1996, Petitioner's counsel filed a lengthy omnibus motion, which, inter alia, sought discovery additional to that provided with the state's voluntary disclosure form, and requested Mapp, Huntley, Wade, and Dunaway hearings.

On May 9, 1996, Petitioner's counsel was advised by the District Attorney's Office that a detective and police officer involved in the arrest had been the subject of improper activities. On May 15, 1996, Petitioner's counsel demanded documents relating to those officers, and on June 21, 1996, moved to compel the production of those documents. On September 23, 1996, after discussion by court and counsel, it was determined, based on the representations by the prosecution about the evidence it would present at trial, that no Mapp, Huntley, or Dunaway hearings were required, and after consultation with the defendant, Petitioner's counsel withdrew her request for a Wade hearing because of the identifying witnesses' prior familiarity with the defendant. (9/23/96 Hrg. Tr. at 6-15.) Petitioner's counsel also moved in limine to preclude witnesses to the January 22, 1996 altercation from testifying about Petitioner's possession of a knife or to Petitioner's biting and severing DeLeon's finger during the altercation on the grounds that the probative value of the evidence was outweighed by its prejudice. Testimony as to the severing of the finger was excluded. (Id. at 20-23.) The transcript

reveals that all <u>Rosario</u> materials, with the exception of Ortiz's plea minutes, were turned over to the defense in a timely manner prior to trial. (<u>Id.</u> at 24.) The Court's review of these records does not reveal any deficiency in Petitioner's counsel's pretrial actions.

After trial commenced on October 7, 1996, Petitioner's counsel's opening statement reminded the jury that sympathy for a wounded eight-year-old child should not affect their determination as to the guilt of the defendant. Petitioner's counsel further asserted that there were many grounds for reasonable doubt as to Petitioner's guilt, including the confusion at the scene, problems with the credibility of the prosecution's witnesses, and lapses in the prosecution's investigation. During the presentation of the prosecution's case, counsel objected to the prosecution's questions on numerous occasions, and even to the judge's questions, and many of her objections were sustained. Petitioner's counsel also attempted to exclude Ortiz's testimony that Petitioner sold medicines and crack cocaine on the street, arguing that it was unfairly prejudicial evidence of uncharged crimes. (Trial Tr. at 827-29, 832.) Petitioner's counsel cross-examined every prosecution witness and called two witnesses in the Petitioner's defense, one of whom—Manny DeLeon—she argued was the actual shooter. Her cross-examination of Anthony Ortiz was lengthy and dealt with his history of drug dealing, his cooperation agreement with the prosecution, his criminal activities and criminal record, as well as his family relationships to other prosecution witnesses.

In her summation, Petitioner's counsel focused on the failures of the police to engage in certain investigative techniques; the evidence of confusion and uncertainty facing the eyewitnesses during the shootout; Ortiz's criminal record, history of drug dealing, and cooperation agreement with the prosecution; discrepancies between Ortiz's

testimony and that of DeLeon; and the fact that no witness for the prosecution was able to confirm Ortiz's testimony that the Petitioner fired at him from the southeast corner of Columbus Avenue and 105th Street.

Petitioner's counsel further urged that the evidence was insufficient to show that Petitioner had fired the bullet that wounded John Paul Valentine. She argued that Valentine, who was proceeding west, and traveling away from the Petitioner, had been shot in the chest, and that Petitioner was, by all accounts, on the east side of Columbus Avenue. She pointed out that the police had not recovered the bullets Ortiz claimed had been fired at him. Petitioner's counsel also argued that DeLeon, not the Petitioner, was the person shooting at Ortiz, based on lay witness Santos's testimony that the individual who shot at Ortiz was wearing a green jacket and DeLeon's admission that he owned a green jacket. Thus, she argued there was reasonable doubt that Petitioner was the shooter.

Petitioner's Reply Memorandum contains an additional ineffective assistance of counsel claim rooted in his allegation that the prosecution failed to disclose to the defense a January 23, 1996 videotape of Ortiz's statement to the police (Reply Mem. at 37) and that this failure so upset the adversarial balance between prosecution and defense as to render the trial unfair. (Reply Mem. at 40.) This claim is based on Petitioner's conclusion that Ortiz made a videotaped statement to the prosecution on January 23, 1996. However, although the Police Investigation Bureau Follow-Up Report, dated January 23, 1996, states in its last paragraph that Ortiz was going to be interrogated by the Manhattan District Attorney's Office, and was "then removed from the R.I.P. office and taken to the video room," (Investigation Bureau Follow-Up Report dated Jan. 23,

1996, attached as Ex. D to Voluntary Disclosure Form dated Feb. 20, 1996, attached as Ex. A to Resp.'s Mem. in Opp. to Pet.'s § 440.10 Mot.), there is no evidence that a videotape of Ortiz's statements was made. Accordingly, this claim is without merit.[8]

Petitioner also claims his counsel was ineffective because she failed to interview the nurse who handled the bullet that Detective Kerr testified fell from John Paul Valentine's clothing while he was being undressed at the hospital. (Reply Mem. at 47-50.) This claim cannot succeed, however, because any such failure does not constitute ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 688 (1984). The officer testified that he saw the bullet fall and the nurse pick it up and hand it to him. Thus, there were no grounds for counsel to believe that the nurse was a material witness, as Petitioner argues. Under the circumstances, the likelihood that the nurse picked up the bullet elsewhere or that there were other bullets in the operating room is remote. Furthermore, there was no doubt that John Paul Valentine was wounded by a bullet and the bullet's proximity to the wound was established by Detective Kerr's testimony. Accordingly, any failure by Petitioner's counsel to interview or call the nurse as a witness does not constitute ineffective representation.

Nor does Petitioner's claim that his counsel should have placed John Paul Valentine's clothes in evidence (Reply Mem. at 51-55) support a finding of ineffective assistance of counsel. The thrust of counsel's defense was that the police had arrested the wrong man—i.e., that it was reasonable to conclude that DeLeon or someone other than

---

[8] The record indicates that this ineffective assistance of counsel claim was not raised by Petitioner or his appellate counsel prior to the instant habeas proceeding. In fact, Petitioner did not raise the claim in his initial petition (Pet. at 4), but rather raised it for the first time in his Reply Memorandum. For this reason, Respondent did not have an opportunity to raise the issue of procedural default or challenge the claim on the merits. Nonetheless, this Court need not request additional briefing from the parties on this claim because, as discussed above, it is without merit.

Petitioner was the shooter—not whether the bullet had actually entered John Paul Valentine's body from the back as opposed to the front, as Petitioner now argues. For Petitioner's counsel not to dispute the doctor's testimony that the bullet entered John Paul Valentine's body from the front by placing Valentine's jacket in evidence is a trial judgment that does not constitute ineffective assistance of counsel. See Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (Merely asserting that defense counsel's trial strategy was deficient is not sufficient unless the petitioner can prove that the representation "was unreasonable under prevailing professional norms and that the challenged action was not sound strategy."); Mason v. Scully, 16 F.3d 38, 42 (2d Cir. 1994) ("Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance.") (citing Strickland, 466 U.S. at 689). Such a tactic might divert the jury from counsel's argument that the police had arrested the wrong man and cause the jury to feel that the defense was grasping at straws since there was no question John Paul Valentine had been wounded by a bullet during the shoot-out. Instead, Petitioner's counsel chose to use the doctor's evidence that the bullet entered from Valentine's chest to argue in summation that Petitioner could not have wounded Valentine because Petitioner was behind Valentine when he was wounded.

Furthermore, contrary to Petitioner's argument that counsel failed to avail herself of a ballistics expert (Reply Mem. at 41-44), the record makes clear that on October 11, 1996, five days before the ballistics expert testified, Petitioner's counsel obtained the assistance of a Mr. Breglio, a ballistics expert, to review the ballistics evidence on behalf of the defense. (Trial Tr. at 1073; Order dated Oct. 11, 1996, attached as Ex. F to Resp.'s Mem. in Opp. to Pet.'s § 440.10 Mot. (authorizing defense counsel "to obtain the

necessary and reasonable services of a ballistics expert, Robert Breglio").)  Counsel's cross-examination of the prosecution's ballistics witness demonstrated that she availed herself of that assistance.  This argument by Petitioner is thus without support.  (Pet.'s Reply Mem. at 41-46.)

Petitioner's argument that his counsel did not see the police reports or reports of witness interviews (Pet.'s Reply Mem. at 51-55) is also belied by the record.  On September 30, 1996, his counsel reported to the trial court that she had received the police reports, interviews of witnesses, and grand jury testimony the previous week. (9/30/96 Hrg. Tr. at 9.)

Similarly, Petitioner's argument that the bullet found in John Paul Valentine's clothes should have been the subject of a motion to suppress and an evidentiary hearing is meritless because Petitioner did not have standing to press such a motion.  Although failure to file a suppression motion can amount to ineffective assistance of counsel, a defendant "must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice."  Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).  "Fourth Amendment rights are personal rights which . . . cannot be vicariously asserted," and suppression of the product of a Fourth Amendment violation can be sought only by those whose rights are violated by the search.  Rakas v. Illinois, 439 U.S. 128, 133-34 (1978).  Here, the personal rights belonged to John Paul Valentine not Petitioner.

Petitioner's presentation of evidence that his trial counsel was subsequently disbarred is troubling, but the record shows that the disbarment was not for

incompetence, but for bringing contraband into a prison.  See In re Watson, 282 A.D.2d 96, 725 N.Y.S.2d 310 (1st Dept. 2001).

In sum, the Court's review finds that Petitioner's counsel's conduct did not "undermine[] the proper functioning of the adversarial process," Strickland, 466 U.S. at 692, and that Petitioner has no valid claim of ineffective assistance of counsel.

**CONCLUSION**

For the reasons stated above, Petitioner's § 2254 petition is denied.  In addition, because Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue, see 28 U.S.C. § 2253(c)(2); Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-13 (2d Cir. 2000); Soto v. United States, 185 F.3d 48, 51-53 (2d Cir. 1997), and the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Opinion and Order would not be taken in good faith.  See Coppedge v. United States, 369 U.S. 438, 445 (1962).

IT IS SO ORDERED.

Dated:  New York, New York
      July 25, 2005

                             Robert P. Patterson, Jr.
                             U.S.D.J.

*Copies of this Opinion and Order sent to*:


For <u>Pro</u> <u>Se</u> Petitioner:

Orelvis Feliz
97-A-6178
Livingston Correctional Facility
P.O. Box 1991
Route 36
Sonyea, NY 14556


For Respondent:

Robert M. Morgenthau
District Attorney, New York County
One Hogan Place
New York, NY 10013
By:     Grace Vee, Assistant District Attorney
Phone: 212-335-9000
Fax:    212-335-9288